## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| NATHANIEL JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:03 CV-0090-IPJ-RRA |
| | ) | |
| SHERIFF JOHN TIREY, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OF OPINION</u>

Nathaniel Jones, hereinafter referred to as plaintiff, has filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 alleging that rights, privileges, or immunities afforded him under the Constitution or laws of the United States were abridged during his incarceration at Walker County Jail in Jasper, Alabama.[1]  Plaintiff names Sheriff Mark Tirey, Jail Administrator Trent McCluskey, Lt. Richard DeJesus and Sgt. Donna Wise as defendants.[2]  He seeks monetary relief.

The magistrate judge entered an Order for Special Report (doc. 13) directing that copies of the complaint in this action be forwarded to defendants and requesting that they file a special report addressing the factual allegations of plaintiff's complaint.  The defendants were advised that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, would be considered as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  By the same Order, plaintiff was advised that after he received a copy of the special

---

[1]  Plaintiff is now an inmate at the Federal Medical Center in Lexington, Kentucky. He does not dispute he was an inmate at Walker County Jail from August 8, 2002, to February 20, 2003.  (Doc. 22, Exhibit A).

[2]  Plaintiff named other defendants and made additional claims and requests for relief in his original complaint. In a Report and Recommendation entered March 1, 2004, the magistrate judge recommended the dismissal of all defendants, claims, and requests for relief, with the exception of the claims and requests for relief against the defendants set out herein.  By order entered  May 17, 2004, the undersigned adopted the magistrate judge's recommendation.

report submitted by the defendants he should file counter affidavits if he wished to rebut the matters presented by the defendants in the special report. Plaintiff was further advised that such affidavits should be filed within twenty days after receiving a copy of the defendants' special report.

The defendants filed a special report (doc. 22) accompanied by affidavits and pertinent documents. Plaintiff was thereafter notified that he would have twenty days to respond to the motion for summary judgment, filing affidavits or other material if he chose. Plaintiff was advised of the consequences of any default or failure to comply with FED. R. CIV. P. 56. *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). (Doc. 30). Plaintiff filed responses. (Doc. 32 & 33).

## SUMMARY JUDGMENT STANDARD

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law.

2

*See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990), *cert. denied*, 498 U.S. 1103 (1991).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (citation omitted).  However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment.  *See Perry v. Thompson*, 786 F.2d 1093 (11th Cir. 1986).

## FACTUAL ALLEGATIONS

The following factual allegations are undisputed, or if disputed, taken in a light most favorable to plaintiff.  Around 7:30 p.m. on August 8, 2002, plaintiff was booked into Walker County Jail, a federal holding facility, subsequent to being charged with a federal crime.  (Doc. 1, p. 4).  After lunch on August 10, 2002, "the officers came and requested . . . the inmates . . .lockdown[, and] all complied."  *Id.* at 4.  Plaintiff went into his cell and fell asleep.  *Id.*  However, he was awakened by "a lot of noise entering the block," his door was opened, "and they yelled, 'outside right now.'"  *Id.*  Plaintiff went to put on his shoes, and "they yelled, 'spray him, spray that big boy.'"  *Id.*  In his original complaint, filed January 14, 2003, plaintiff alleged

> After leaving the cell and being instructed to get on the floor I was sprayed in the face with [mace] and or pepper spray.  While on the floor[,] they began to kick and yell obscenities to us on the floor.  I am in the blind while all sorts of [derogatory] statements are being said . . . [M]y belief is that the sheriff was yelling because he says that "it[']s my jail I'm taking back."  While coughing and gagging I hear yelled, "Who sleeps in D-3[?]"  [A]t first no one answers so they asked

3

again[.]  [A]t that time I said[,] "I do[.]"  At that point I was sprayed continuously at close range in the head, eyes, face and ears.  They accused me of writing on the wall of the cell that I was sleeping in, "F–k the pigs[.]"  Now I had not been there 48 hours yet.  He said I was going to wash it off and not to say anything or I would be sprayed again.  With all of us still [laying] on the floor they began to throw Bibles and books at us, they poured Kool Aid all over us.  This was done from the top tier as well.  They then told us to go out to the exercise yard where I had to be led to, and left us outside for about an hour.  My sight gradually came back to me by days end but the burning did not stop, and my back and body was in pain.  My eyes and vision [are] not totally clear and things are hazy a lot at points of view.  I had never been sprayed before, and have yet to receive the requested needed medical attention.[3]

After the inmates returned from the exercise yard, they were placed in lockdown status. (Doc.

1, p. 6).

In his affidavit in opposition to defendants' motion for summary judgment, plaintiff attests

that Sheriff Tirey led the group of officers or men into his cellblock, and that he personally saw

---

[3]  *Id.* at 5-6.  Sheriff Tirey denies that he "sprayed Mr. Jones on any occasion [or] that [he] acted, or caused anyone to act, in any manner so as to deprive inmate Nathaniel Jones of any type of medical care or treatment during his incarceration. . . . . " (Doc. 22, Tirey affidavit, p. 4).

Jail Administrator McCluskey makes no mention of the incident, but asserts the "internal grievance procedures" at Walker County Jail are made known to the inmates upon admission to the jail.  *Id.* at McCluskey affidavit, p. 2.  Plaintiff did not sign a form indicating he received a copy of the Inmate Handbook until October 10, 2002.  *Id.* at Exhibit A, p. 2. However, the court finds this to be of no consequence since plaintiff does not deny he became of aware of the policy on admission.  McCluskey also contends it is evident that plaintiff was aware of the grievance process because plaintiff did in fact file grievances.  *Id.*  There are 3 grievances and 1 letter produced by defendants, the contents of which relate only to visits to the law library, complaints about and money reimbursed to plaintiff's account for medication he did not receive, and information concerning an inmate theft incident in his cell block.  *Id.* at Exhibit A, pp. 3-7.

Officer DeJesus attests he was off duty on the day of the incident, and only "present at the jail when [he] returned a schedule."  *Id.* at DeJesus affidavit, p. 1.  DeJesus denies engaging in any law enforcement activities while at the jail, and denies that plaintiff ever asked him for a grievance form.  *Id.* at 1-2.

Officer Wise admits only that she was working the night of the incident and corroborates that DeJesus was not assigned to work that evening.  *Id.* at Wise affidavit, p. 1. She does not remember plaintiff ever asking for a grievance form, and attests she would have given him one had he asked.  *Id.*

4

defendant DeJesus among the group.[4]  He also states he received no medical attention, nor was he "allowed access to any means to wash . . . .[even though] he made an "oral request later that day of August 10, 2002, concerning [his] eyes and condition."  *Id.*  Plaintiff also asserts he "filed a grievance and/or request forms to the staff concerning my medical and physical needs because of the abusive treatment that [I] received from offi[c]ers on August 10, 2002," and indicates that the same were "refused by the Sheriff, DeJesus and Wise. . . .," although he does not elaborate.[5]

---

[4] (Doc. 32, plaintiff's affidavit, at 1).  Plaintiff only filed an excessive force claim against defendant Tirey in his complaint, and did not make any allegations that defendant DeJesus was present on August 10, 2002, until filing his opposition to defendants' special report.  Therefore, to the extent plaintiff may now be attempting to state an excessive force claim against defendant DeJesus, the same shall not be considered.

[5] *Id. See also* Doc. 32, Exhibit Q, p. 3, wherein plaintiff contends that on August 10, 2002, he "asked for medical care but was refused by the Sheriff, DeJesus and Wise."

Sheriff Tirey declares that, pursuant to jail policy, inmates are entitled to, and may not be denied medical care.  (Doc. 22, Tirey affidavit, pp. 1-2).  An inmate desiring medical treatment may fill out a medical request form, which is forwarded to the jail nurse.  If an inmate specifically asks to see a physician, the nurse will file the request for a physician.  *Id.* at 2.  Tirey points to a copy of the jail record, as certified by he and defendant McCluskey, and asserts that no medical requests were ever filed by plaintiff.  *Id.* at 3-4, and (McCluskey affidavit, p. 2).  Tirey then points to the Walker County Jail Inmate Rules and Regulations Handbook, in which the guidelines for filing grievances is set out, and contends that since plaintiff did file some grievances, he was aware of the policy.  *Id.* at Tirey affidavit, pp. 1-2.

Jail Administrator McCluskey attests he never received a medical request from plaintiff and that if he had, he would have forwarded same to the jail nurse.  *Id.* at McCluskey affidavit, p. 2.

Officer DeJesus attests plaintiff did not request a grievance form from him, never made oral or written statements to him requesting medical treatment, and to the best of his knowledge believes plaintiff was afforded all medical treatment to which plaintiff was entitled while at Walker County Jail.  *Id.* at DeJesus affidavit, pp. 1-2.

Officer Wise attests she does not remember plaintiff ever asking her for a grievance form, or making oral or written statements requesting medical treatment.  *Id.* at Wise affidavit, pp. 1-2.  She also attests that she would have forwarded any request for medical treatment to the jail nurse, and that to the best of her knowledge, she believes plaintiff was afforded all medical treatment to which plaintiff was entitled.  *Id.*

Inmates Jose Gonzales, Kevin Tolbert and Sherman McAbee attest that they too were inmates at the Walker County Jail on August 10, 2002.  (Doc. 33, *see generally* affidavits of Gonzales, Tolbert, and McAbee).  Inmate Tolbert "witnessed . . . Mark Tirey and a group of men enter[] the jail . . . with an aggressive and abusive nature." *Id.* at Tolbert affidavit, p. 1.  Inmate Gonzales saw and heard a group of noisy officers entering the cellblock that afternoon, and saw that plaintiff was pepper sprayed twice. *Id.* at Gonzales affidavit, p. 1.  Inmate McAbee corroborates that the officers entered the dorm "with loud claps." *Id.* at McAbee affidavit, p. 1.  McAbee confirms the inmates were told to lie face down on the floor, and that he heard Sheriff Tirey state that it was his jail and he was taking it back. *Id.*  McAbee also heard the group of men questioning "who slept in the cell with obscenities on the wall[,]" saw that plaintiff was blinded by pepper spray, and could hear plaintiff gagging. *Id.*  Gonzales, Tolbert and McAbee all attest that they did not see plaintiff or any other inmate behave in a manner such that the amount of force used by the group of men was necessitated. *Id.*  Gonzales then declares the inmates in the block were locked in their cells without medical attention. *Id.* at Gonzales affidavit, p. 1.  Gonzales, Tolbert and McAbee each complain that requests and grievances were not answered by jail staff. *Id.*

Also attached to plaintiff's opposition to defendants' special report is a copy of Walker County Jail's Inmate Handbook, Rules and Regulations.  (Doc. 32, Exhibit R).[6]  Section 16 of the Handbook pertains to Inmate Grievances. *Id.* at p. 9.  It reads as follows:

---

[6]  In his opposition brief, plaintiff references Exhibits R, S, T, V, and W.  (Doc. 32, at 1-12).  However, plaintiff did not organize his exhibits in alphabetical order, nor did he, for the most part, label any of the exhibits.  The court has taken pains to determine the title of each exhibit referenced in the opposition brief, and organize same with tabs designating each exhibit in alphabetical order.  Further, in brief, plaintiff does not even provide an exhibit designation for two of his documents.  Since logic would dictate that "U" would be the appropriate alphabetical earmark for this untitled exhibit, liberty was taken to officially title Exhibit U as such.

16.1  If you have a grievance, you can report it on an Inmate Request Form.  Only one signature is allowed on a grievance.

16.2  Your grievance will be investigated and answered, in writing, within 72 hours of the time it is received, excluding weekends and holidays.  Grievances are first answered by the appropriate staff at the lowest level in the chain of command.

16.3   If you are not satisfied with the first answer to your grievance, you may send a grievance to the next higher command level (attach a copy of the first grievance.) You may continue to send it through the chain of command, up to the Sheriff, who will make the final decision.

16.4  We will not take any negative action against you because you file a grievance.

*Id*.  Plaintiff then contends that he "directed all request[s] and grievances to staff members per instruction of the form.  (sic) Staff supervis[o]rs DeJesus, Wise, McClusk[e]y [and Tirey], but each time my grievances and requests were ignored and/or unanswered.  *Id.* at  Exhibit Q, p. 2.

During his stay at Walker County Jail, plaintiff also complains various conditions of his confinement constituted cruel and unusual punishment, and that he was denied medical care.  In his complaint filed January 2003, plaintiff writes, "We have been locked down at times for 10-11 days in a room that had not been cleaned, nor could you flush the toilet; yet [we were] forced to eat inside the cell."  (Doc. 1, p. 7).  He also declares,

[O]n or about [August 21, 2002,] Trent McCluskey[7] was called to the block because Officer Randy Brown had left our door open[.]  [I]t had been left open due to the toilet not flushing and the odor gathering inside.  It was left open for fresh air[.] [W]e requested disinfectant to put in the toilet we had not flushed in 4 days; Mr. McCluskey came to the cell and I told him the toilet does not flush . . . could we get it fixed and some disinfectant.  I also told him it had not been flushed in 4 days[.]

---

[7]  Defendant McCluskey does not deny this incident occurred.  (Doc. 22, McCluskey affidavit p. 1-2).  McCluskey does attest that internal grievance procedures are available to inmates at the jail and that plaintiff was aware of the grievance process.  *Id*. at 2.  McCluskey also attests that as custodian of records, the documents attached to the special report are true and accurate copies of documents found in plaintiff's inmate file.  *Id*.  There are no grievances pertaining to the condition of plaintiff's cell in McCluskey's records.  (Doc. 22, Exhibit A).

> [H]is reply was[,] "I am going to secure the door." It wasn't [repaired] until I was returned from court and mentioned in the presence of the U.S. Marshal[s] about being in that locked cell for 11 days without the toilet being able to flush and my cellmate and I forced to continually use it. The smell was sickening, and it created little bugs that infested inside and outside of the room.

*Id.* at 5.

Elsewhere in the complaint, plaintiff writes, "there are rashes and skin irritation all over my arms, back [and legs, and] items are no longer available to allow you to combat dry skin and anything else. The toilets are not clean, and I have never seen a toilet brush[.] [L]ittle bumps have broken out on the posterior of inmates (my cell mate particularly)." *Id.* at 10.

Plaintiff also alleges the jail

> does not answer grievances or request forms written or verbally. Request[s] have been made requesting religious services, counseling, or any session that may help one to cope. There were no Bibles in this jail, . . . , no law library access or paging system, no special visits from people traveling distances over 100 miles, no radio, no television, no newspaper, no magazines, books or anything to help an inmate maintain self. . . . We are like animals being held for slaughter[.] [D]ays come and go with nothing being fulfilled. This is pre-trial detention, we are locked up all day and at times 72 hours before being able to come out to do anything. . . . If guards did not have to come to the block to feed us[,] we would probably be forgotten about. They only come to get you for court, or if you have been called out for some reason. We have no lights in our cells and the buzzer does not work to get . . . attention. I feel that my medical needs have not been met mentally and physically[.] [N]o kind of skin care or over the counter medications are offered by [the] commissary. . . . . We have been on a lockdown for 61 days or more and no disciplinary has been filed or explanation given.

*Id.* at 7-8. In his affidavit proffered in opposition to defendants' motion for summary judgment, plaintiff additionally attests that he ultimately spent 94 days for what "appeared" to be 24 hours per day, in an unlighted cell so dark that "on most occasions" he could not see to write, and that he witnessed staff throwing grievances in the garbage. (Doc. 32, Exhibit Q, p. 2). He also alleges he

made medical requests on several dates[,] including but not limited to August 22, 2002, October 5, 2002, and October 15, 2002.  Complaints were made about my back, eyes, neck, head[] and a need to have some kind of medical help . . . . I . . . never received any response to any request or grievance for medical attention until October-November. . . . I made requests stating I could not see in the cell. . . .  I . . . was forced to remai[n] on lockdown status for 11 days in an unlighted cell where I was not able to flush the toilet where black bugs developed. . . . I was made to eat meals in the same cell . . . and was not afforded cleaning supplies . . . . There was no television, radio, or book to occupy me. . . . I requested assistance concerning these conditions verbally and in writing to Tirey, DeJesus, Wise and McClusk[e]y, but no relief was given[,] with the exception of the toilet situation[.] [T]hat situation was only remedied because I was able to talk to the U.S. Marshals and the Courts during a Court appearance.

*Id.* at p. 2-3, and Exhibit T, pp. 1-3.

During a court appearance, the trial judge informed plaintiff that he would appoint plaintiff new counsel and reset his sentencing hearing.[8]  Further, it appears plaintiff had made a Bar complaint since the trial judge asked in the presence of Mr. Linton,  plaintiff's fourth attorney, "You make reference in your Bar complaint that you are, or were, I'm not sure you are now, in twenty hours a day lock down; is that correct?", to which plaintiff responded, "Yes, sir." *Id.*  When the trial judge asked what other problems plaintiff encountered, he replied,

Well, from when we first got there there (sic) were problems about - - there was physical abuse.  There was the way that they were in the jail for no reason.  I was waking up out of my sleep and sprayed with mace and kicked and throwed (sic) on the floor.  But that's a different matter, how they locked us down for those hours.  For the first few days there was no - - not being let out of the cell at all . . . .  And during that entire period we had no lights in the cell.  It was always dark in the cell for the days we were on lockdown. . . . But other than that, you know, the way they work in Walker County jail at that particular time has not been right.  For some reason over the past thirty days, we've seen a lot of changes like the way they do

---

[8]  Exhibit T at p.1.  Although the transcript does not reveal the date plaintiff was taken to court, in his original complaint, plaintiff wrote, "On 9-11-02 I was appointed my 4th lawyer [identified as Mr. Linton] by the court and made mention of this situation."  (Doc. 1, p. 8).  In his original complaint, plaintiff was referring to his toilet situation.  However, contrary to plaintiff assertion, his toiletry problems were not mentioned to the court.

things.  At first they wouldn't answer a request for grievances or anything.  But I've seen changes as of late.[9]

In his original complaint, plaintiff attaches duplicate copies of several requests written while incarcerated at Walker County Jail, and attests he never received a response to same, although he later admitted his grievances were responded to in "October-November."  (Doc. 32, Exhibit Q, p. 2).  In any event, the copies of grievances produced by plaintiff are as follows[10]:

| Date | Request or grievance, and defendant to whom same directed.  (Doc. 1). |
|---|---|

| Date | Request or grievance, and defendant to whom same directed. |
|---|---|
| 8/22/02 | <u>Shift Supervisor, Second Shift</u> - "I would like to be seen by someone concerning my eyes as well as some counseling. I find a need to talk to someone to explain why I have been treated this way.  Lastly but not least (sic) we are in need of our toilet needing to be flushed[.] (sic) [I]t does not and we have inquired at all officers including maintenance man. . .and Jail Administrator."  p.12. |
| 8/26/02 | <u>Chief Jail Administrator, First Shift</u>- "We need our toilet fixed. [W]e have been made to stay in this cell and eat, along with all else for the past 10 days[.] [W]e have made requests to [Officers] Kay, Estes, Brown, Pendley, . . . Jail Administrator McCluskey . . . [and] also Lt. Woodley."  p. 14. |
| 10/3/02 | <u>Sheriff</u> - "At this jail you can not see how to write in your cell[,] even though you choose to have a 22 hour a day lockdown. It always stays to[o] dark inside of cells for person to be able to prepare for anything. . . . I am being denied the ability to see how to read or write on my matter."  p. 20 |
| 10/5/02 | <u>Shift Lieutenant, First Shift</u> - "I came into Walker County Jail needing some medical [attention] and already under some degree of counseling of a mental [nature.] [N]ow[,] inasmuch as my stay here has heightened both due to the treatment that I have come to know as 'What one should expect when you go to jail[,]' it has become wors[e] and multiplied. My eyes, as well as my back, head and neck has caused me problems[.][M]y need for counseling or social worker [or psychiatric attention] remains[.]" p.13. |

---

[9]  *Id.* at 1-2.  This testimony conflicts with plaintiff's allegations.  However, absent any other specifics, said testimony raises no other questions other than the credibility of plaintiff, which is not an issue to be decided by the court in determining summary judgment.

[10]  Defendants Tirey, Wise, McCluskey and DeJesus all deny that they ever received any of the grievances produced by plaintiff and further deny plaintiff requested grievance forms.  (Doc. 22, see Tirey, Wise, McCluskey and DeJesus affidavits).

| 10/5/02 | <u>Shift Lieutenant, First Shift</u> - "I have requested in the past special visits from [a] counselor and or minister . . . . No answer has ever been given [to] me concerning anything save my going to [a] doctor once . . . . I am grieving the procedure - mostly I have not known why I am disciplined or was treated in [a] manner not called for [on] 8-10-02."  p. 16. |
| 10/15/02 | <u>Shift Lieutenant, (unspecified shift)</u> - "I have continuously requested medical attention be it physical or mental.  I have put in request after request to no avail at all.  Walker County Jail does nothing but cause you to sink deeper and deeper in any situation that you a part of.  I need medical attention.  I have passed out on the floor several times."  p. 21. |
| 10/18/02 | <u>Unknown</u> - "My condition of my nerves in my back has gotten to the point that I am being denied the use of my legs because of losing the feeling in them.  I often get up only to fall down, and not being able to feel anything from my waist down[.]  This has happened and the jail has been made aware of this.  They told me that . . . nothing [could be] done."  p.22. |

Plaintiff asserts that the above allegations constitute violations of his Eighth and Fourteenth Amendment constitutional rights.  *Id.* at 8.  For relief, plaintiff requests monetary and punitive damages.  *Id.* at 11.

## DEFENDANTS' LEGAL RESPONSE[11]

Defendants assert the affirmative defenses of absolute and qualified immunity.  (Doc. 22, pp. 5-6).  Defendants additionally contend plaintiff failed to exhaust administrative remedies available to him through the Walker County Jail grievance procedure, and the Alabama Board of Adjustment. *Id.* at 7.

## OFFICIAL CAPACITY

To the extent plaintiff's constitutional claims can be considered against any defendant in his/her official capacity, defendants' motion for summary judgment is due to be granted under the doctrine of sovereign or absolute immunity.  It is well settled that the Eleventh Amendment to the

---

[11]   Defendants submitted affidavits and documentary evidence in support of their positions. However, said evidence has already been examined in the "Factual Allegations" portion of this report and recommendation.

11

United States Constitution bars Section 1983 claims in federal court against the state or an agency

of the state.  *Alabama v. Pugh*, 438 U.S. 781,  98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *see also*

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67

(1984).  The Supreme Court in *Pugh*, stated:

> [T]here can be no doubt . . . that suit against the State and its Board of Corrections
> is barred by the Eleventh Amendment, unless Alabama has consented to the filing of
> such a suit.  *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Department
> of Treasury*, 323 U.S. 459 (1945); *Worcester County Trust Co. v. Riley*, 302 U.S. 292
> (1937).  Respondents do not contend that Alabama has consented to this suit, and it
> appears that no consent could be given under Art. I, sec. 14, of the Alabama
> Constitution, which provides that "the State of Alabama shall never be made a
> defendant in any court of law or equity."

438 U.S. at 782.  "Absent a legitimate abrogation of immunity by Congress or a waiver of immunity

by the state being sued, the Eleventh Amendment is an absolute bar to suit by an individual against

a state or its agencies in federal court.  *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d

662 (1974)."  *Gamble v. Florida Dept. of Health & Rehabilitative Services*, 779 F.2d 1509, 1511

(11th Cir. 1986).  Accordingly, plaintiff cannot maintain a § 1983 action against defendant in his/her

official capacity.  Therefore, the remainder of this report and recommendation will address the

constitutional claims against defendants in their individual capacity, and will discuss the merits of

defendants' qualified immunity defense within the deliberation of the separate claims.

## BOARD OF ADJUSTMENT

The Alabama State Board of Adjustment is a legislatively created body with the power and

jurisdiction to hear specifically enumerated claims against the State of Alabama, its agencies,

commissions, boards, institutions, or departments.  *See* §§ 41-9-60, 41-9-62, ALA. CODE.  The

Alabama Supreme Court has held that the purpose of the Board of Adjustment is "to extend[ ] a

measure of compensation or relief to citizens entitled thereto, who unfortunately suffered injury

occasioned by the state or one of its agencies, commissions, boards or institutions or departments,while engaged in the performance of the sovereign functions or duties of the state, and for which the rule of sovereign immunity exempts the state and its respective agencies, commissions, boards, institutions or departments from any other duly recognized form of legal action to compensate for such unlawful act and proximate injury." *State ex rel. McQueen v. Brandon*, 12 So. 2d 319, 325 (1943).

Thus, "[t]he Board of Adjustment has jurisdiction over claims against the state *that are not justiciable in the courts because of the state's constitutional immunity from suit*." *Matthews v. Alabama Agricultural & Mechanical University*, 716 So. 2d 1272, 1281 (Ala. Civ. App. 1998) (emphasis added) (*citing Lee v. Cunningham*, 176 So. 477 (1937)). *Accord Vaughan v. Sibley*, 709 So. 2d 482, 486 (Ala. Civ. App. 1997) (the "Board of Adjustment has jurisdiction over claims against the state that are not justiciable in the courts because of the state's constitutional immunity from being made a defendant"). It is also clear that the Board of Adjustment lacks jurisdiction over claims cognizable in the Alabama courts. *Hawkins v. State Board of Adjustment*, 7 So. 2d 775, 776 (Ala. 1942).

Where a § 1983 claim is stated against a defendant in his individual capacity, he is <u>not</u> entitled to Eleventh Amendment immunity and this court has jurisdiction over such claims.[12] It is therefore clear that the Board of Adjustment would have no jurisdiction over the § 1983 claims stated against defendants in their individual capacities only.[13]

---

[12] State courts and federal courts have concurrent jurisdiction over claims filed pursuant to 42 U.S.C. § 1983. *Felder v. Casey*, 487 U. S. 131, 139 (1988); *Arkansas Writer's Project, Inc. v. Ragland*, 481 U. S. 221, 234 (1987).

[13] *Horton v. Briley*, 792 So. 2d 432 (Ala. Civ. App. 2001).

## ADMINISTRATIVE REMEDIES

When viewing §1983 claims, the Eleventh Circuit has strictly applied the mandatory exhaustion of administrative remedies requirement in §1997e(a).  *Alexander v. Hawk*, 159 F.3d 1321, 1323 (1998). This application is rooted in the Supreme Court's instruction that "'[w]here Congress specifically mandates, exhaustion is required.'" [14]  Further, the Eleventh Circuit has decided that "the term 'available' in section 1997e(a) is [simply] used to acknowledge that not all prisons have administrative remedy programs," not that a court must gauge the merits of the remedies, if provided.[15]  As such, an inmate must exhaust his administrative remedies even if the relief provided by the grievance procedure or the grievance procedure itself is inadequate and futile.[16] This too, relies upon the Supreme Court's finding that "where exhaustion is a statutorily specified jurisdictional prerequisite, 'the requirement . . . may not be dispensed with merely by a judicial conclusion of futility.'"[17]

Defendants assert that plaintiff failed to file grievances in accordance with the Walker County Jail Inmate Handbook in connection any of the allegations presently at issue.  Plaintiff counters that he did indeed attempt to file grievances concerning all of his allegations in the manner dictated by the Inmate Handbook, although he produces copies of only seven (7) grievances.  Thus, if the factual

---

[14] *Id.* at 1325, *citing McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct.1081, 1086, 117 L.Ed. 291 (1992).

[15] *Id.* at 1326.

[16] *Id.* "1997e(a) merely provides for such 'administrative remedies as are available' ", thereby allowing the court to focus only on the existence of an administrative remedy and preventing the court to determine whether such remedies are adequate or effective.

[17] *Id., citing Weinberger v. Salfi*, 422 U.S. 749, 766, 95 S.Ct. 2457, 2467, 45 L.Ed. 522 (1975).

allegations are construed a light most favorable to plaintiff, he did exhaust the administrative remedies available to him as specified by the jail handbook.

## **EXCESSIVE FORCE**

Defendant Tirey asserts the affirmative defense of qualified immunity in connection with plaintiff's claim of excessive force. However,

> [i]n this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution . . . . There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation. . . . The only question, then, is whether the plaintiff has alleged facts sufficient to survive a motion to dismiss or motion for summary judgment. If he has done so, that is the end of the inquiry.

*Skrtich v Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002), (citing *Johnson v. Breeden*, 280 F.3d 1308, 1319 (11th Cir. 2002) *quoting Whitley v. Albers,* 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), and *Hudson v. McMillan*, 502 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Since qualified immunity is not at issue, the remainder of the section is dedicated to determining whether plaintiff has alleged sufficient facts to survive defendant motion for summary judgment.

Plaintiff claims Sheriff Tirey's use of force violated his right to be free from cruel and unusual punishment. Plaintiff was a pre-trial detainee when he was pepper sprayed. Plaintiff claims that defendant's use of pepper spray constituted cruel and unusual punishment in violation of his Eighth and Fourteenth Amendment rights. However, the Eighth Amendment's prohibition on cruel and unusual punishment does not apply until after formal conviction. *See Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977). At the time of the incident complained of, plaintiff had not been convicted, but was confined pending trial.

15

The government may detain a person charged with a criminal offense "to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment or otherwise violate the Constitution." *Bell v. Wolfish*, 441 U.S. 520, 536-37 (1979).  Conditions and restrictions imposed upon pretrial detainees that are "reasonably related to a legitimate governmental interest, [do] not, without more, amount to 'punishment.'"  *Id*. at 539.  Maintaining security and order in the detention facility is clearly a legitimate governmental interest.  *Id*. at 540.  "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial."  *Id*.  Consequently, the mere fact that force was used against a detainee does not, standing alone, constitute a violation of the detainee's constitutional rights.  *See H.C. v. Jarrard*, 786 F.2d 1080, 1085 (11th Cir. 1986); *Fickes v. Jefferson County*, 900 F. Supp. 84, 91 (E.D. Tex. 1995).  However, the Due Process Clause of the Fourteenth Amendment does protect "a pretrial detainee from the use of excessive force that amounts to punishment."  *Graham v. Conner*, 490 U.S. 386, 395 n.10 (1989).   It appears, then, that plaintiff's claim is more accurately expressed as that he was subjected to excessive force in violation of his Fourteenth Amendment rights.

Excessive force claims by pretrial detainees are analyzed under the standards set forth by the Supreme Court in *Whitley v. Albers*, 475 U.S. 312 (1986), and *Hudson v. McMillan*, 503 U.S. 1 (1992).  *Valencia v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir.), *cert. denied*, 509 U.S. 905 (1993).  "While [*Whitley* and *Hudson*] specifically addressed claims of excessive use of force brought by convicted prisoners, it is impractical to draw a line between convicted prisoners and pretrial

16

detainees for the purpose of maintaining jail security." *Valencia v. Wiggins*, 981 F.2d at 1446.  In

*Hudson*, the Court held that in assessing an inmate's excessive force claim, "the core judicial inquiry

is that set out in *Whitley*:  whether force was applied in a good-faith effort to maintain or restore

discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillan*, 503 U.S. at 6-7.

In extending *Whitley* to all cases involving allegations of the use of force by prison officials, the

Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use
> force to keep order.  Whether the prison disturbance is a riot or a lesser disruption,
> corrections officers must balance the need "to maintain or restore discipline" through
> force against the risk of injury to inmates.  Both situations may require prison
> officials to act quickly and decisively.  Likewise, both implicate the principle that
> "'[p]rison administrators . . . should be accorded wide-ranging deference in the
> adoption and execution of policies and practices that in their judgment are needed to
> preserve internal order and discipline and to maintain institutional security.'"

*Hudson v. McMillian*, 503 U.S. at 6 (citations omitted).  With these concerns in mind, the Court set

out certain factors that should be considered in evaluating whether the force used was excessive.

These factors include: 1) "the need for application of force"; 2) "the relationship between that need

and the amount of force used"; 3) "the threat 'reasonably perceived by the responsible officials'";

4) "any efforts made to temper the severity of a forceful response"; and 5) "the extent of the injury

suffered by the inmate."  *Id.* at 7.  *See also H.C. v. Jarrard*, 786 F.2d at 1085.

As the Seventh Circuit Court of Appeals has observed:

> When an order is given to an inmate there are only so many choices available
> to the correctional officer.  If it is an order that requires action by the [inmate], and
> the inmate cannot be persuaded to obey the order, some means must be used to
> compel compliance, such as a chemical agent or physical force.

*Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984), *cert. denied*, 470 U.S. 1085 (1985).  The "use

of [a chemical] substance in small amounts may be a necessary prison technique if a prisoner refuses

17

after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required." *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979).[18]

> The infliction of pain and the danger of serious harm may be necessary if there is a threat of an equal or greater harm to others, as is reflected in the doctrine of self defense which permits one to do harm to another person who threatens unlawfully to do an equal or greater harm to another.

*Id*., *quoted in Soto v. Dickey*, 744 F.2d at 1270.   Furthermore, "[t]he responsible institutional personnel on the spot are in a better position to determine when [the use of a chemical substance] is necessary than the courts." *Soto v. Dickey*, 744 F.2d at 1270.

### *Discussion*

Viewing the allegations in a light most favorable to plaintiff,  there was no need to use force against plaintiff, much less throwing objects at plaintiff, kicking plaintiff, and causing two blasts of mace to be sprayed on plaintiff's head, face and mouth, simply because defendant Tirey thought plaintiff may have written on the wall of his cell.   Plaintiff complains that he was in pain all afternoon and his vision has been impaired.   Sheriff Tirey is the individual responsible for all operations at the Walker County Jail, he personally led the group attack on the inmates, and gave orders to create havoc throughout the block.   As such, he was personally involved in the incident.

The core judicial inquiry of "whether force was applied in a good faith effort to maintain or restore discipline, or inflicted maliciously and sadistically for the very purpose of causing harm" is guided by the mandate that institutional officials must be given deference in the manner in which

---

[18]   *Soto v. Dickey* and *Spain v. Procunier*, like *Whitley* and *Hudson*, involve excessive force claims by convicted prisoners.  However, when, as in this case, institutional order and security are threatened, "it is impractical to draw a line between convicted prisoners and pretrial detainees." *Valencia v. Wiggins*, 981 F.2d at 1446.

18

they maintain order.  *See, e.g., Sims v. Mashburn*, 25 F.3d 980, 984 (11th Cir. 1994);  *Williams v. Burton*, 943 F.2d 1572 (11th Cir. 1991), *cert. denied*, 505 U.S. 1208 (1992).  Defendant denies that he personally pepper sprayed plaintiff, but does not deny that he was in plaintiff's cell block on that date, that there were other officers in the block under his direct authority and direction, and that the treatment rendered to the inmates, including plaintiff, was under his authority and direction.  Thus, defendant Tirey's motion for summary judgment is due to be denied as a matter of law.

## DENIAL OF MEDICAL CARE

In *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976), "the Supreme Court held that deliberate indifference to serious medical needs is proscribed by the Eighth Amendment's prohibition against cruel and unusual punishment."  *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994).  A two-part analysis is employed in determining whether an Eighth Amendment violation has occurred. "First, we must evaluate whether there was evidence of a serious medical need; if so, we must then consider whether [the defendants'] response to that need amounted to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989).  The first inquiry is objective; the second inquiry is subjective.  *See Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1186 (11th Cir. 1994).

"'[A] "serious" medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d at 1187 (quoting *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977)).  "[T]he medical need of the prisoner need not be life threatening" to be considered "serious."  *Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir. 1988).

The second part of the inquiry -- whether the response of the defendant amounted to deliberate indifference -- is itself a two-part determination.  A defendant may be held liable for an Eighth Amendment violation only if he had "knowledge of the [plaintiff's] particular medical condition," *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d at 1191 (emphasis omitted), *and* he acted intentionally or recklessly to deny or to delay "access to medical care" or to interfere "with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. at 104-05.  *See also Mandel v. Doe*, 888 F.2d at 788.  *See generally Farmer v. Brennan*, 511 U.S. 825, 833-842 (1994).  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  "Mere negligence or medical malpractice" on the part of the defendants is not sufficient to support an Eighth Amendment claim.  *Mandel v. Doe*, 888 F.2d at 787-88.  *See also Barfield v. Brierton*, 883 F.2d 923, 939 (11th Cir. 1989).  Therefore, an accidental or inadvertent failure to provide medical care or negligent diagnosis or treatment of a medical condition does not constitute a wrong under the Eighth Amendment.  *Estelle*, 429 U.S. at 106.  "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).  "Medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id*.

It is clear that "[s]ome delay in rendering medical treatment may be tolerable depending on the nature of the medical need and the reason for the delay." *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995).  It is only when "delay in access to medical care . . . is 'tantamount to "unnecessary

and wanton infliction of pain,"' [that it] may constitute deliberate indifference to a prisoner's serious medical needs." *Id.*, (*quoting Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir.), *cert. denied*, 496 U.S. 928 (1990)).   To succeed on a claim "that delay in medical treatment rose to a constitutional violation," an inmate "must place verifying medical evidence in the record to establish the detrimental effect of [the] delay in medical treatment." *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d at 1188.   *See also Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991); *Martin v. Tyson*, 845 F.2d 1451, 1458 (7th Cir.) *cert. denied*, 488 U.S. 863 (1988).

<u>Initial Pepper Spray</u>

Construing the initial incident on August 8, 2002, in plaintiff's favor, he was afforded no medical attention after he was pepper sprayed, and told by Sheriff Tirey to wash it out himself. Plaintiff asserts that he was in pain all afternoon, and suffered some visual repercussions from the pepper spraying.   The court finds that if plaintiff was twice pepper sprayed about the head, face, ears and mouth such that he was in pain, blinded, coughing and gagging, said symptoms constituted a serious medical need, at least on August 8, 2002.   Plaintiff appears to have been afforded no opportunity to care for himself after the incident and no professional medical attention, since he contends that immediately after the assault he had to be led to the exercise yard, where he remained for some period of time before being returned to his cell.   While in some circumstances a delay in medical treatment may be tolerable, there is no justification in plaintiff's situation.

The entire purpose of pepper spray is to cause extreme pain and discomfort to its receiver. Therefore, refusing to provide or interfering with medical relief after exposure is tantamount to a wanton and unnecessary infliction of pain.   Plaintiff has established he suffered from a serious

21

medical need immediately after the incident, and the lack of treatment he received constituted deliberate indifference to same. Defendant Tirey denies that he either personally prevented or caused plaintiff to be denied medical treatment. However, it is well established that assessing the credibility of the allegations of plaintiff or defendant are beyond the scope of a trial court's ruling on a motion for summary judgment. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255; *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996); *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties*, 941 F.2d 1428, 1437 (11th Cir. 1991); *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1425 (11th Cir. 1990). Thus, to the extent plaintiff claims defendant Tirey denied him medical attention on August 8, 2002, he has stated an Eighth Amendment claim against Tirey.

Defendant Tirey asserts that he is entitled to qualified immunity in connection with this portion of plaintiff's claim. However, plaintiff's suffering, and the reasons therefore, were so obvious that a layperson, much less a seasoned law enforcement professional such as Sheriff Tirey, would have known that to refuse treatment to plaintiff constituted deliberate indifference to his serious medical needs. *See Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176 (11th Cir. 1994). Accordingly, defendant Tirey is not entitled to qualified immunity with regard to this portion of plaintiff's claims.

Long term repercussions of pepper spray and remaining medical complaints.

With regard plaintiff's additional medical complaints, the limited clarity of same can be found in plaintiff's original complaint and exhibits. It appears that on August 22, 2002, plaintiff

22

wrote a request asking to be seen by someone about his eyes.  Said request was received by defendant DeJesus or Wise.[19]

On October 5, 2002, plaintiff requested treatment for his eyes, back, neck, and head, and stated that his need for mental health counseling still remained.  In it, he admits that he has seen a doctor on at least one occasion between August 22, 2002, and October 5, 2002, but provides no further information.  This request was sent to defendant DeJesus.  Plaintiff provides no information as to whether he was taken to the health care unit after his October 5, 2002,  complaint, other than his general assertion that the jail never responds to grievances or requests.  On October 15, 2002, plaintiff stated that a nerve condition in his back had worsened, he had no feeling in his legs, and did not feel anything from waist down.  The court is unable to discern who received plaintiff's last request.

Plaintiff alleged in his complaint that none of his requests were honored.  However, there is evidence that he did receive responses to his requests since he informed the trial judge at some unknown date that conditions at the jail had improved within the "last month," and in an affidavit in opposition to defendants' motions for summary judgment, he asserts he did receive responses to his requests for medical attention in October and November.  Defendants DeJesus and Wise either deny or do not remember any requests for medical attention made by plaintiff, and both assert they would have given plaintiff a grievance form or passed his medical request to the jail nurse if they had been given such a form or request.

---

[19]  Since inmates are not allowed to mark the party to whom the grievance is sent, and the form dictates a jail official designate the particular officer in the chain of command to whom the grievance is sent, it is presumed, for summary judgment purposes, that the particular officer designated on each grievance was the officer to whom the grievance was directed.  (Doc. 1, p. 12-14, 16, 20-22).

Nevertheless, even if the court assumes plaintiff's allegations are true and construes them in a light most favorable to him, he has failed to state an Eighth Amendment medical care claim against defendants DeJesus and Wise.  First, while plaintiff's claims of serious medical needs may have passed muster for the 28 U.S.C. § 1915A screening process, he has subsequently failed to provide any further factual detail concerning his conditions.  Additionally, plaintiff admits that he was seen by a doctor at least once between August 8, 2002, and October 5, 2002, and also admits  his medical requests were responded to beginning in "October-November."  Finally, plaintiff provides absolutely no evidence verifying that he suffered any injury due to some unspecified delay in medical treatment.  Accordingly, plaintiff has failed to provide genuine disputed factual allegations in support of each element of his Eighth Amendment medical care claims against defendant DeJesus and Wise.  As such, the motion for summary judgment filed by defendants DeJesus and Wise is due to be granted as a matter of law, and judgment entered in their favor.

## CONDITIONS OF CONFINEMENT

Conditions of confinement claims by convicted prisoners are governed by the Eighth Amendment proscription against cruel and unusual punishment. *Bell v. Wolfish*, 441 U.S. 520 (1979).  In order to establish an Eighth Amendment violation, a plaintiff  "must prove three elements:  (1) a condition of confinement that inflicted unnecessary pain or suffering [constituting cruel and unusual punishment],  *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), (2) the defendant[s'] 'deliberate indifference' to that condition, *Wilson v. Seiter*, [502] U.S. [294, 303], 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991), and (3) causation, *Williams v. Bennett*, 689 F.2d 1389-90 (11th Cir. 1982)." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993) (footnotes omitted), *cert. denied*, 510 U.S. 1164 (1994).  Whether a particular condition of

24

confinement constituted cruel and unusual punishment is an objective inquiry; whether prison officials were deliberately indifferent to that condition is a subjective inquiry. *See Wilson v. Seiter*, 502 U.S. at 290.

Prison conditions amount to cruel and unusual punishment only when they result in "unquestioned and serious deprivation of basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). While it is the duty of prison officials to furnish prisoners with "reasonably adequate" food, clothing, shelter, and sanitation, *Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir. 1977), *rev'd in part on other grounds*, 438 U.S. 781 (1978), the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. at 349. As the Eleventh Circuit Court of Appeals observed in *Newman*: "[T]he Constitution does not require that prisoners be provided any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration." 559 F.2d at 291.

> [C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

*Rhodes v. Chapman*, 452 U.S. at 347.

"To be deliberately indifferent, a prison official must knowingly or recklessly disregard an inmate's basic needs." *LaMarca v. Turner*, 995 F.2d at 1535. In order to establish that an official was deliberately indifferent, "a plaintiff must prove that the official possessed knowledge both of the infirm condition and of the means to cure that condition, 'so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it.'" *Id*. at 1535 (*quoting*

*Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985), *cert. denied*, 479 U.S. 816 (1986)). *Accord Farmer v. Brennan*, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994).

Plaintiff was forced to remain on lockdown status for 11 days in an unlighted cell where he and his cellmate were unable to flush the toilet. Black bugs developed around the toilet, and plaintiff was made to eat his meals in the same cell with the smell and infestation. Plaintiff contends he was refused cleaning supplies or deodorant to offset such conditions, and developed sores on his arms and body. Plaintiff concedes that he was given cleaning supplies sometime after the 11 days in which he had no working toilet, but contends the toilet problem was only resolved after he complained to U.S. Marshals and a trial judge.

Plaintiff also states he remained on lockdown status for 94 days. At various stages of the pleadings plaintiff describes lockdown as being locked in his cell from 20 to 24 hours per day. Plaintiff was allowed no television, radio, or books to occupy himself during this time, and the lighting was so dim he could not see to write. Plaintiff requested assistance with these conditions verbally and in writing from defendants Tirey, McCluskey, DeJesus, and Wise, but no relief was afforded him. Said defendants do not deny that such conditions existed, but do deny that plaintiff properly complained about same.

Plaintiff has adequately stated an Eighth Amendment conditions of confinement claims against Tirey, McCluskey, DeJesus, and Wise. As early as 1977, this Circuit[20] has addressed such claims pertaining to sanitation and plumbing difficulties such as described by plaintiff. *Miller v. Carson*, 563 F.2d 757 (5th Cir. 1977). As aptly stated by the Eleventh Circuit,

---

[20]   In *Bonner v. Prichard*, 661 F.2d 1206,1207 (11th Cir. 1981)(en banc), the Eleventh Circuit "adopted as binding precedent all decisions of the former Fifth Circuit prior to 1 October 1981."

conditions that "deprive inmates of the minimal civilized measure of life's necessities," [*Rhodes v. Chapman*, 452 U.S. 337, 346(1981),] are violative of the "contemporary standard of decency that [the Court] recognized in [*Estelle v. Gamble*, 429 U.S. 97, 103-104, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976) ]," *id.* We observe that it was not without significance to the Court in *Rhodes*, in assessing the effect of double celling in the Southern Ohio Correctional Facility, that "though small, the cells in SOCF are exceptionally modern and functional; they are heated and ventilated and have hot and cold running water and a sanitary toilet." *Id.* at 349 n. 13, 101 S.Ct. at 2400 n. 13.

*Chandler v. Baird*,  926 F.2d 1057, 1064 (11th Cir. 1991).

Moreover, plaintiff remained in his cell for 20 to 24 hours per day in virtual darkness, and was allowed no books, television or radio for approximately 3 months.  Plaintiff requested mental health assistance to cope with the situation.  As written by Justice Brennan in his concurring opinion in *Rhodes*,

In determining when prison conditions pass beyond legitimate punishment and become cruel and unusual, the "touchstone is the effect upon the imprisoned." *Laaman v. Helgemoe*, 437 F.Supp., at 323.  The court must examine the effect upon inmates of the condition of the physical plant (lighting, heat, plumbing, ventilation, living space, noise levels, recreation space); sanitation (control of vermin and insects, food preparation, medical facilities, lavatories and showers, clean places for eating, sleeping, and working); safety (protection from violent, deranged, or diseased inmates, fire protection, emergency evacuation); inmate needs and services (clothing, nutrition, bedding, medical, dental, and mental health care, visitation time, exercise and recreation, educational and rehabilitative programming); and staffing (trained and adequate guards and other staff, avoidance of placing inmates in positions of authority over other inmates).  *See ibid.; Ramos v. Lamm*, 639 F.2d, at 567-581. When "the cumulative impact of the conditions of incarceration threatens the physical, mental, and emotional health and well-being of the inmates and/or creates a probability of recidivism and future incarceration," the court must conclude that the conditions violate the Constitution.  *Laaman v. Helgemoe*, *supra*, at 323.

*Rhodes v. Chapman*, 452 U.S. at 364.

While certainly plaintiff's cell did not specifically exhibit (among the lack of other severe conditional deprivations)  the "dark hole" and isolation found in prisons in the 1970's, it is certainly

questionable whether such conditions offend contemporary standards of decency.  *See Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974), *Miller v. Carson*, 563 F.2d 741 (5th Cir. 1977).  For the foregoing reasons, the court finds that the conditions endured by plaintiff at Walker County Jail are satisfactory to state an Eighth Amendment claim against defendants Tirey, DeJesus, Wise and McCluskey.

Since the court has determined that the plaintiff's allegations, if true, establish a constitutional violation, it now turns to the question of whether defendants are entitled to qualified immunity.  The doctrine of qualified immunity shields government officials engaging in a discretionary function of their position from damages unless their acts or decisions contravene clearly established constitutional or statutory rights of which a reasonable official should have knowledge.  *See Mitchell v. Forsyth*, 472 U.S. 511 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  In the present case, it was certainly within the scope of authority and duty of each defendant to alleviate the conditions in plaintiff's cell.  *See Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994) ("discretionary authority" includes "all actions of a governmental official that (1) 'were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority'") (*quoting Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)).

Having acknowledged that defendants' response to plaintiff's conditions were within their discretionary function, the court must study whether "a reasonable official [in the position of defendants] would understand that what [t]he[y] [are] doing violate[d] [plaintiff's constitutional] right[s]."  *Anderson v. Creighton*, 483 U.S. 636, 641 (1987).  To accomplish this examination "for qualified immunity purposes[,] . . . [the court must look to] decisions [governing the conduct at issue] [by] the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the

28

state where the case arose." *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826-27 n. 4 (11th Cir. 1997), quoted in *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998)).   This is because an inherent aspect of qualified immunity is the concept that "before they are subjected to suit, officers are on notice that their conduct is unlawful." *Hope* v. *Pelzer*, 536 U.S. 730, 731 (2002).   While previous cases having materially similar facts can certainly makes officials aware of unlawful conduct,

> [t]h[e] [Supreme] Court's opinion in *United States v. Lanier*, 520 U.S. 259 . . . .[1997] . . ., makes clear that officials can be on notice that their conduct violates established law even in novel factual situations.  Indeed, the Court expressly rejected a requirement that previous cases be "fundamentally similar."   Accordingly, the salient question that the Eleventh Circuit should . . .ask[] . . . is whether the state of the law in [2002] gave [defendants] fair warning that [the conditions of plaintiff's confinement were] unconstitutional. . . .

*Id.*

In 2002, reasonable prison officials in positions such as defendants Tirey, Wise, McCurley and DeJesus would have known plaintiff's predicament was unlawful.   As illustrated above, Supreme Court and Eleventh Circuit precedent spoke to the issues raised by plaintiff before 2002 Like *Hope*, the "obvious cruelty inherent . . . " in such conditions provides the notice necessary to inform the defendants plaintiff's treatment was unlawful.   Accordingly, defendants Tirey, McCurley, Wise and DeJesus are not entitled to qualified immunity or summary judgment in their favor as to plaintiff's claims regarding the conditions of his confinement.

## CONCLUSION

For the reasons stated above, the motion for summary judgment filed by defendants Tirey, Wise, McCurley and DeJesus is due to be DENIED IN PART and GRANTED IN PART as follows:

1.   The Court EXPRESSLY FINDS that there are genuine disputed issues of material fact with regard to the motion for summary judgment filed by defendant Tirey in connection with plaintiff's Eighth Amendment allegations of excessive force.  Therefore, defendant Tirey's motion is due to be DENIED.

2.   The Court EXPRESSLY FINDS that there are genuine disputed issues of material fact with regard to the motion for summary judgment filed by defendant Tirey in connection with plaintiff's Eighth Amendment claim that, after being pepper sprayed on August 8, 2002, defendant Tirey refused to allow plaintiff any medical attention.  Therefore, defendant Tirey's motion  is due to be DENIED.

3.   The EXPRESSLY FINDS that there are genuine disputed issues of material fact with regard to the motion for summary judgment filed by defendants Tirey, DeJesus, Wise and McCurley and pertaining to the 94 days plaintiff spent in lockdown status in an unlighted cell, with no books, magazines, or television, 11 days of which plaintiff was forced to remain with no toilet.

4.   The motion for summary judgment filed by defendants Tirey, DeJesus, Wise and McCurley in connection with all remaining Eighth Amendment medical care claims made by plaintiff is due to be GRANTED.

An appropriate Order shall be entered.

DONE on this 1st day of September, 2005.

_____
INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE